United States District Court
Southern District of Texas
ENTERED
December 14, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 5:16-CR-1100-2 |
| | § | |
| DANIEL EDUARDO GARZA-MARTINEZ | § | |
| | § | |

# REPORT AND RECOMMENDATION

Defendant Daniel Eduardo Garza–Martinez has been charged with bulk cash smuggling out of the United States in violation of Title 31, United States Code, Section 5332. (Dkt. No. 26). Defendant has filed a motion to suppress statements obtained by the Department of Homeland Security, Homeland Security Investigations ("HSI"), agents in the course of a custodial interview of Defendant at a Laredo Port of Entry in Laredo, Texas, on August 28, 2016. (Dkt. No. 43). Defendant maintains he made his statements only after (1) he executed a written waiver of his *Miranda* rights without awareness of the consequences of waiver, and (2) the HSI agents unlawfully coerced him. Those circumstances, Defendant contends, compel the conclusion that the statements were involuntarily made and must be suppressed.

The undersigned held a hearing on the motion to suppress on November 14, 2016. Defendant, currently in custody, attended and was represented by counsel. Two of the agents who had taken part in the August 28 interview—HSI Special Agent Jason Stewart ("Stewart") and HSI Temporary Field Officer/Laredo police officer Roberto Peralta ("Peralta")—testified. The parties also presented portions of audio and video recordings of Defendant's August 28 interview, the entirety of which had been admitted by stipulation.[1]

[1] The parties also prepared for the Court, and stipulated to the admission of, a transcribed translation of the interview that had been conducted largely in Spanish. The parties noted the transcription was not verbatim, but they agreed it

Having considered the matter, the undersigned concludes that the agents did not violate the Fifth Amendment. Therefore, the undersigned **RECOMMENDS** that the District Judge, after an independent review of the record, **DENY** Defendant's motion to suppress. (Dkt. No. 48).

## FACTUAL BACKGROUND

On August 28, 2016, Defendant and Co-Defendant Javier Omar Villarreal-Garza ("Villarreal-Garza"), driving south toward Mexico, entered the Port of Entry of Laredo in Laredo, Texas. Villarreal–Garza drove while Defendant rode in the passenger seat. Customs and Border Patrol ("CBP") officers stationed southbound at the Port of Entry asked for declarations of currency in excess of $10,000; both defendants denied having that much currency in the car. The CBP officers then searched the car and discovered nearly $137,000 in United States currency hidden inside the backrests of the driver and passenger seats, in addition to currency on Defendant's person.

After the discovery of the hidden currency, HSI agents responded and arrived at the port of entry to interview Defendant. The interview lasted approximately one hour and a half.[2] The video of the interview reveals Defendant was seated at a desk, while Stewart and Peralta sat on the other side of the desk, facing Defendant. At least one other agent is at various points visible in the video, on the same side of the desk as Peralta and Stewart.

Defendant is a native Spanish speaker, so Peralta, who is also a native Spanish speaker and a twenty-six year veteran of the Laredo Police department, assumed the primary role of conducting the interview and helping to translate for the HSI agents present. Peralta began the

conveyed fairly and accurately the substance of all relevant portions of the interview. All citations to the transcript, admitted as Government Exhibit 3, are to the page number on the transcript.

[2] Stewart described the interview in two parts: The agents began by questioning Defendant, and then left to question Villarreal-Garza. Afterwards, the agents returned to Defendant and re-initiated the interview briefly. (11/14/16 Hearing at 2:50).

interview with background questions in Spanish. During this time, Defendant stated that he was the manager of a bar in Monterrey, Mexico, and confirmed that he did not understand English, but understands and writes in Spanish. (*See* Tr. at 4–5).

Peralta then proceeded to advise Defendant of his *Miranda* rights, using the Spanish version of DHS ICE Form 73-025. (Hearing 11/14/16 at 1:57–1:58); *see* Gov't Ex. 1. After reading the top portion of the form warning Defendant of his rights, Peralta explained that the bottom portion of the form "is if you decide to waive your rights," and asked Defendant if he understood the rights just read to him and if he wanted to read the document. (Tr. at 5). Peralta then turned the form over to Defendant and asked him to execute the waiver with his signature. Defendant noted he would like time to read the document and took a few minutes to read it. He asked, "If I sign here, am I waiving my rights? Because, I don't even know what you're going to ask me. I am just asking." (*Id.*).

Peralta did not respond directly but answered, "The reason for your rights . . . You're in the United States. And because you're in the United States, everybody has rights." (Tr. at 5–6). The agents would ask questions, Peralta added, and based on Defendant's answers, the agents might arrest him, or might not arrest him. (*Id.*). Peralta gave a few basic examples of questions the agents might ask and explained that he was unable to advise Defendant as to whether he "need[ed] an attorney or not"; that question, Peralta explained, Defendant would have to answer for himself. (*Id.* at 6). Then, Peralta stated that "[o]ur obligation is to inform you of your rights, if you are doing something illegal or not. Do you understand now?" (*Id.*).

Defendant responded, "Yes, I understand now. I was just asking in case I did waive my rights, the only thing that's going to happen . . . ." (*Id.*). Before he finished, Peralta interjected, "Did I answer your question?" (*Id.*). Defendant said that he had. Peralta again asked for

Defendant's signature on the waiver. Defendant signed it without additional substantive questions. Peralta and Stewart also signed the form witnessing Defendant's signature. (11/14/16 Hearing at 2:51); *see* Gov't Ex. 1.

At the hearing, Peralta commented on the events captured on the interview video and testified that after he explained the rights to Defendant, Defendant did not seem to understand so he explained further. (Hearing 11/14/16 at 2:13). Peralta testified that Defendant then signed the waiver of rights and stated that he understood and did not ask for additional clarification. (*Id*. at 2:14).

The agents then sought Defendant's account of how he and Villarreal-Garza had arrived in Laredo that day. For much of the interview, Defendant repeated that he and Villarreal-Garza had come to the United States a week earlier for shopping and vacation; they were returning home to Monterrey that day, and they had no knowledge of the currency concealed in the seats.

As Defendant continued to deny knowledge of the currency, the agents grew visibly impatient, and the tenor of the interview changed. Stewart testified at the hearing that the change of tone was intentional—he had hoped "to elicit an emotional response because [he] felt that [Defendant] was lying and not giving full answers." (Hearing 11/14/16 at 2:52). The agents employed several schemes in pursuit of that goal.

As one illustration, Defendant replayed three portions of the interview video revealing that Stewart addressed Defendant angrily with a raised voice while reaching part way across the desk, gesturing animatedly with his hands near Defendant's face. Defendant appeared largely non-responsive to that behavior. (Hearing 11/14/16 at 2:55–2:57). Stewart testified that Defendant's demeanor did not change, nor did Defendant move away from him or act frightened. (*Id*. at 3:05). Rather, Defendant continued to say during the interview that he was not afraid of

anything. (*Id.*). Also during the course of the interview, Peralta pointed out that, unlike police interrogations in Mexico, arrested persons in the United States could choose whether to talk:

> It's a matter of choice you're making. In Mexico, they're going to beat you, or they're going to shoot you or cut you into pieces, follow your family. But, here you're in the U.S. It's a matter of choice whether you're going to tell us what's really going on. If you're thinking of that, that may happen over there, but not here in the U.S.

(Tr. at 32). Peralta also explained that "at the same time we're here to help you." (*Id*. at 33). "But, we can't help you until you help yourself," he added, and asked, "What do you want? You want to spend a lot of time, or you want to spend a little time?"—apparently implying Defendant's cooperation or lack thereof might bear on his eventual sentence. (*Id*.). Defendant, however, responded that he did not want to start again and was "going to stick with that story." (*Id*.).

Peralta then switched the interview tone to emphasize the risk of cartel violence that Defendant might face, asking "What do you think is going to happen to you as soon as you get over there without your money?" (Tr. at 34). "[O]nce you cross without the cash," Peralta added, "they're going to beat you and maybe cut you up into pieces for not having the money." (*Id*.). "What they want is their money. And what we're going to do, we're going to seize your money." (*Id*.). The third agent present at the interview then reiterated, "We know that the money's not yours," and asked, "You did know about the money that was inside the car, right?" (*Id*.). Defendant, despite the previous denials, responded, "Yes, I did know." (Tr. at 35).

As noted, based on that admission and the discovery of the currency in the car, Defendant was eventually charged with bulk cash smuggling. (Dkt. No. 26). He has now moved to suppress the admission, along with any other statements made in the interview, contending that

the waiver he executed was invalid because it was involuntarily and unknowingly made, and that the HSI agents unlawfully coerced him into admitting knowledge of the hidden currency.

## ANALYSIS

Defendant's statement during the HSI custodial interrogation is inadmissible at trial unless the Government can establish that Defendant knowingly and voluntarily waived his *Miranda* rights when making the statement. *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010). A valid waiver must be (1) "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks omitted)); *Garcia v. Stephens*, 793 F.3d 513, 521 (5th Cir. 2015). The Government bears the burden of proving by a preponderance of the evidence that both the waiver of *Miranda* rights and the confession were voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167–68 (1986); *United States v. Tsou*, 983 F.2d 1061 (5th Cir. 1993); *United States v. Raymer*, 876 F.2d 383, 386 (5th Cir. 1989). Defendant contends that the Government has failed to carry its burden with respect to both conditions here.

### A. The Voluntariness Determination

Courts making the voluntariness determination in the Fifth Circuit have taken the question case-by-case, viewing the question "under the totality of the circumstances." *United States v. Reynolds*, 367 F.3d 294, 298 (5th Cir. 2004). A crucial factor for consideration in the determination, the Fifth Circuit has explained, "is the presence or absence of coercive behavior on the part of the government." *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005).

Typically for purposes of this determination, voluntariness will depend "on the absence of police overreaching," as opposed to "free choice in any broader sense of the word." *Id*.

Several instructive principles inform the voluntariness determination. A confession is not involuntary merely because a suspect is advised "there are advantages to cooperating." *United States v. Ornelas-Rodriguez,* 12 F.3d 1339, 1347–48 (5th Cir. 1994); *see also United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) (concluding assertion that accused's cooperation would be made known to court would not render subsequent confession involuntary). It is reasonable to assume in these circumstances, the Fifth Circuit has observed, "that the cooperation of an arrested person often is prompted by a desire for leniency for himself or others," and statements thus made are not *per se* involuntary. *United States v. Robertson,* 582 F.2d 1356, 1368 (5th Cir. 1978); *see also United States v. Ivory,* 397 F. App'x 40, 41 (5th Cir. 2010) (same). A promise of leniency may nevertheless be "a factor to consider in determining whether a statement" has been voluntarily made, but indirect or implicit promises have only a fraction of the "potency" of direct promises, and weigh less heavily in the calculation. *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988); *see also Miller v. Fenton,* 796 F.2d 598, 610 (3d Cir. 1986) ("As we have stated above, indirect promises do not have the potency of direct promises."). Similarly, threat of a lengthy sentence in the absence of a confession, whether explicit or implicit, will not render a waiver involuntary; that tactic, the Fifth Circuit has explained, is "customary," *Cardenas*, 410 F.3d at 295, and does no more than offer a suspect the opportunity "to make an informed decision" regarding the costs and benefits of cooperating with the government, *Ballard*, 586 F.2d at 1063. *See also United States v. Rico*, 51 F.3d 495, 507 (5th Cir. 1995) ("Manuel claims that the agents . . . stated that he and Debra would be sent to prison

for the rest of their lives because of their crimes; but such allegations, even if proved true, would be insufficient, standing alone, to establish that his subsequent cooperation was involuntary.").

The case law also makes clear that a credible threat of violence may render a waiver and confession involuntary, and as the Supreme Court has recognized, "coercion can be mental as well as physical," *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). Thus, where an investigating agent promises protection from an angry mob immediately outside the jailhouse door or from other inmates in exchange for a confession, a suspect's will may be "overborne in such a way as to render his confession the product of coercion." *Id.* at 288 (discussing *Payne v. Arkansas*, 356 U.S. 560, 561 (1958)). Where a confession is not "motivated" by a threat, or where a threat is less imminent, coercion is less likely to be found. *Fulminante*, 499 U.S. at 287; *see also United States v. Sanchez*, 614 F.3d 876, 885 (8th Cir. 2010); *Gurrola v. McDonald*, 627 F. App'x 601, 602 (9th Cir. 2015).

Here, Defendant points to the agents' repeated emphasis of the potential for drug cartel violence upon his return to Mexico, in combination with Peralta's apparent implicit promise of leniency in asking "do you want to spend a lot of time or a little," as circumstances compelling a conclusion that his waiver was coerced and involuntary. The record guides the determination here, however, and makes two propositions clear.

First, Defendant at several times during the interview insisted that he foresaw no threat in Mexico, had no specific fears of cartel retaliation against his family, and had no knowledge of any specific cartel attempts to intimidate him thus far. The threats in *Fulminante* and *Payne*, by contrast, had already emerged—the Defendant in *Fulminante* had started "to get some tough treatment" from other inmates, and in *Payne*, the mob had materialized outside the jailhouse door. *Fulminante*, 499 U.S. at 283; *Payne*, 356 U.S. at 561. Defendant's denial of the existence

of the threat here, coupled with the threat's more generalized, theoretical character, suggest something other than fear of physical violence motivated him to confess. *See, e.g., Gurrola* 627 F. App'x at 602 (concluding that defendant's confession was not motivated by fear where defendant "did not express any fear or concern" about potential gang threat).

Second, Peralta's query—"You want to spend a lot of time, or you want to spend a little time"—may have constituted an implicit promise of leniency, but as noted, implicit promises weigh less heavily in the voluntariness determination than explicit promises. *See Lynaugh*, 844 F.2d at 1140. Immediately after Peralta posed the question, moreover, the agents asked if Defendant might like to change his account, but Defendant responded "I'm going to stick with that story," suggesting Peralta's potential promise had done little to change his position. *See Cardenas*, 410 F.3d at 295. Just as importantly, the record reveals Peralta and the other agents present at several times indicated Defendant was likely to be imprisoned if involved in a crime, regardless of whether he provided information. They noted his exposure to imprisonment would depend largely on decisions made by prosecutors and judges, effectively diminishing any coercive effect of Peralta's original question. *See United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996) ("Officers informed [defendant] that the U.S. Attorney would be apprised of his cooperation, but he was unequivocally informed that even if he cooperated, he would still go to prison."); *Ballard*, 586 F.2d at 1063 (explaining that "[t]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging her to tell the truth" will not render a statement involuntary).

Given the customary police tactics employed here, Defendant's apparent lack of concern for the threat of potential cartel violence, the lack of evidence that a specific threat had materialized here, and the extent of the information communicated regarding his potential

exposure to imprisonment, the Court concludes that under the totality of the circumstances, Defendant executed his waiver voluntarily and free from any improper intimidation, coercion, or deception. *See Cardenas*, 410 F.3d at 293 (concluding "customary police tactics," including emphasis of potential benefits of cooperation, will not "overcome a defendant's free will"); *Broussard*, 80 F.3d at 1034 (concluding statements voluntarily made where agents encouraged cooperation but "unequivocally informed" defendant he would go to prison).

**B. Defendant's Awareness of the Rights Abandoned**

Defendant adds that regardless of whether he was coerced, he executed his waiver without "full awareness of both the nature of the right[s] being abandoned and the consequences of the decision," and as he correctly notes, both forms of awareness are also required by the case law. *United States v. Hearn*, 563 F.3d 95, 104 (5th Cir. 2009).

In evaluating the sufficiency of a suspect's awareness of the rights he may waive, Fifth Circuit courts have considered a variety of factors, including age, education, criminal history, general familiarity with the criminal justice system, language skills, and the potential influence of any medication, drugs, or alcohol. *See, e.g, United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994); *see also Hearn*, 563 F.3d at 104; *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998). Description of the rights in written form weighs heavily in favor of knowing waiver, as does presentation of the information in the suspect's native language. *See, e.g., Collins*, 40 F.3d at 98 n.8 (emphasizing presentation of written warnings); *Garcia Abrego*, 141 F.3d at 171 (highlighting presentation of rights in Spanish); *Broussard*, 80 F.3d at 1034 (highlighting presentation of written Spanish warnings). The suspect's demeanor during questioning may be of particular importance, the Fifth Circuit has observed, for a suspect who listens to questions, responds appropriately and logically, and provides information in a logical manner is both likely

to understand any warnings given and unlikely to be under the influence of any intoxicants. *See United States v. Reynolds*, 367 F.3d 294, 299 (5th Cir. 2004). Thus, a suspect's responsiveness to an officer's questions may be "sufficient to show a 'course of conduct indicating waiver' of the right to remain silent." *Berghuis*, 560 U.S. at 386 (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

Here, Defendant was twenty-five years old on the day of the interview, and though the record reveals no information regarding his familiarity with the criminal justice system, he appeared to respond appropriately and with relevant details to the agents' initial background questions. Those factors suggest Defendant was capable of knowing waiver. *See, e.g.*, *Reynolds*, 367 F.3d at 299 (emphasizing importance of coherent, relevant responses); *see also United States v. Oliver*, 630 F.3d 397, 410 (5th Cir. 2011) (same); *accord United States v. Mendenhall*, 446 U.S. 544, 558 (1980) (concluding twenty-year old suspect with an eleventh grade education was "plainly capable of knowing consent"); *United States v. Martinez*, 537 App'x 340, 546 (5th Cir. 2013) (concluding twenty-year old with ten years of schooling was capable of knowing consent). The agents provided Defendant a written form detailing his rights and read it aloud to him; that he listened attentively and asked to read the form suggests he was "able to understand what was transpiring." *Garcia Abrego*, 141 F.3d at 172; *see also Reynolds*, 367 F.3d at 299. Defendant took the form and looked it over, and immediately asked, "if I sign here, am I waiving my rights?"—suggesting he had understood both the significance of the form he had just read as well as the importance of the declarations contained therein. *See Oliver*, 630 F.3d at 410; *Collins*, 40 F.3d at 98.

Defendant makes much of his initial hesitation to sign the waiver, but as the Fifth Circuit has often explained, "mere refusal to sign a waiver does not automatically render inadmissible"

any further statements made. *Oliver*, 630 F.3d at 409. Refusal or hesitation, the *Oliver* court observed, "may indicate nothing more than a reluctance to put pen to paper under the circumstance of custody." *Id*. at 410. Thus, regardless whether a waiver is eventually executed, "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement." *Id*. That Defendant was read his rights, was given an opportunity to read the declaration, appeared to understand the significance of the form, made statements in the "course of conduct indicating waiver," *Berghuis*, 560 U.S. at 384, and later made his admission freely all suggest he was aware of the rights he abandoned.

More importantly, after Defendant expressed his initial hesitation and asked Peralta about waiver, Peralta answered (albeit circuitously) and asked "Do you understand now?"—and Defendant responded "Yes" and signed the waiver. Defendant's affirmative acknowledgement, the Fifth Circuit has explained, weighs in favor of finding he understood the nature of his rights. *See, e.g.*, *United States v. McDaniel*, 293 F. App'x 265, 268–69 (5th Cir. 2008) ("The Government offered proof that McDaniel was read detailed statements of his rights to silence and to counsel and that he stated that he understood them."); *United States v. Hernandez*, 200 F. App'x 283, 288 (5th Cir. 2006) ("Hernandez was read her Miranda warnings in Spanish and was asked to reply after each portion of the warning that she understood what her rights were; she responded affirmatively to these inquiries."). That he then signed the form similarly weighs in favor of finding his understanding. *See, e.g.*, *Rico*, 51 F.3d at 507 (highlighting the fact that defendant "was read his *Miranda* rights in Spanish" and "signed an advice-of-rights card in which he acknowledged waiving those rights."). Finally, nothing in the record indicates Defendant was under the influence of any drug or defect which might have rendered him

incompetent to execute the waiver, and he does not press that argument. *See, e.g., Garcia Abrego*, 141 F.3d at 170; *see also United States v. Solis*, 299 F.3d 420, 438–39 (5th Cir. 2002).

Given these circumstances—the Defendant's age, his demeanor and attentive, appropriate responses and questions, the presentation of warnings both aloud and in written form in his native language, and his signature executing the waiver—the Court concludes that Defendant adequately understood the nature of the rights he proposed to abandon. *See, e.g., Reynolds*, 367 F.3d at 299 (concluding district court did not err in denying motion to suppress where defendant was cooperative, listened to questions, and responded logically and appropriately); *Rico*, 51 F.3d at 507 (emphasizing importance of written presentation in native language); *see also Solis*, 299 F.3d at 438–39 (affirming finding of voluntary confession where there was no indication that defendant was under the influence and defendant was responsive to questions asked).

### C. Defendant's Awareness of the Consequences of Abandonment

Analysis of whether a suspect also understands the consequences of abandoning his rights examines many of the same considerations. Age, demeanor, the form and language of presentation, and the presence or absence of intoxication are all instructive in the inquiry, and for the reasons given in the nature-of-the-rights determination, the circumstances here suggest Defendant adequately understood the consequences of abandonment. *See, e.g., Cardenas*, 410 F.3d at 295 (concluding waiver was valid where defendant was given oral recitation of rights and "said she understood" and "still wished to speak").

Defendant points to Peralta's long answer to Defendant's question of "If I sign here, am I waiving my rights?", and asks the Court to conclude that he did not understand his rights. Although Peralta did not directly answer Defendant's question, he informed him that he had rights in the United States, that the agents wanted to ask him questions, and that he could not him

advise him on whether he needed an attorney or not. Peralta's response is not misleading or incorrect. *See, e.g.*, *Garcia*, 793 F.3d at 522 (comparing confession given after the accused receives multiple correct *Miranda* warnings with a confession given after an officer's incomprehensible instruction strongly suggesting accused should talk, rather than remain silent, to invoke right to remain silent). More importantly, there is no evidence on the record that Peralta's answer negatively affected Defendant's comprehension of his rights. The record suggests otherwise—that Defendant understood his rights and knew how to exercise them. For instance, when the agents returned to question Defendant after they had interviewed Villarreal-Garza, Defendant repeated several times that he had already answered their questions and thrice insisted that he did not have anything else to say. (*See* Tr. 2 at 3, 5, 9). The second part of the interview, thus, ended quickly.

Bolstering the conclusion that Defendant adequately understood the consequences of waiver is the fact that the Supreme Court has many times underscored the point that "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *see also Oregon v. Elstad*, 470 U.S. 298, 316 (1985) ("The Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness."). Instead, the Supreme Court has explained, the "Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect." *Spring*, 479 U.S. at 574. The *Miranda* warnings protect that privilege, the *Spring* court observed, by "ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* Awareness of the consequences of waiver is

thus not to be confused with awareness of the advisability of waiver; as one court has explained, a defendant must merely "know of his available options before deciding what he thinks best suits his particular situation." *Collins v. Brierly*, 492 F.2d 735, 738–39 (3d Cir. 1974); *accord Hearn*, 563 F.3d at 104 ("Collins was fully apprised of her *Miranda* rights and chose to waive those rights by answering the officers' questions.").

Thus, given the presentation of rights both aloud and in written form, Defendant's opportunity to read the declaration and question the agents as to its meaning, Defendant's subsequent execution and later admission in the absence of coercion, and case law defining "understanding" in these circumstances, the Court concludes Defendant adequately understood the consequences of waiver here.

## RECOMMENDATION

For the foregoing reasons, the undersigned concludes Defendant's waiver and subsequent admission were knowingly and voluntarily. The undersigned therefore **RECOMMENDS** that the District Judge, after an independent review of the record, **DENY** Defendant's motion to suppress. (Dkt. No. 43).

## WARNINGS

The parties may file objections to this Report and Recommendation, unless they waive the right to do so. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982) (*en banc*)).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after being served with a copy of the Report—or the party's waiver of the right to do so—shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations and, except upon grounds of plain error, shall bar the party from appellate review of proposed factual findings and legal conclusions accepted by the District Court to which no objections were filed. *See* 28 U.S.C. Section 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150–53 (1985); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (*en banc*).

The Clerk is directed to send a copy of this Report and Recommendation to all parties.

SIGNED this 14th day of December, 2016.

Diana Song Quiroga

DIANA SONG QUIROGA
United States Magistrate Judge